[See 4 Fed. 548.]

---

SCHMIDT (POILLON v.). See Case No. 11,-241.

---

## Case No. 12,466.

SCHMIDT et al. v. SMITH.

[7 Ben. 361.] [1]

District Court, S. D. New York. June, 1874.

CHARTER PARTY—NET MEASUREMENT OF STEAMER—CARGO SPACE OCCUPIED BY COAL.

1. The owners of a steamer chartered her in London to S., for a voyage from New York to the United Kingdom or Europe, by a charter party which described the vessel as "of the net measurement of 537 tons, or thereabouts." On the arrival of the vessel in New York, the agent of S. made a written agreement with S. & D., whereby he chartered the vessel to them for a

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

voyage from New York to Europe, for £1,500, for a full and complete cargo of lawful merchandise, the difference between the £1,500 and the amount of freight on the bills of lading to be settled before sailing. The agreement, after specifying certain conditions as to the loading of the vessel, added: "All other conditions as per charter party, dated London, &c." This charter party was known to S. & D. when they made the agreement with the agent of S. When the vessel came to be loaded, it appeared that she had on board, in a part of the space which was properly for cargo, a quantity of coal weighing 200 tons, and occupying as much space as would be occupied by 150 tons in measurement of such general cargo as S. & D. put on board the vessel; and, when S. & D. had put on board cargo till the vessel was so deep that the master refused to take any more, there still remained space for 50 tons more. She sailed with a cargo of 468 tons in measurement; and, but for the carrying of the coal above spoken of, she could have carried 668 tons. A vessel can generally carry 25 per cent. of tons by measurement more than what is stated in her register as her "net measurement," which, for this vessel, would have made 671 tons. S. & D. filed a libel against S., to recover damages for breach of the agreement made between them, claiming to recover, as such damages, the difference between the freight earned on the goods actually received on board, and that which the vessel would have earned but for her having that cargo space filled with coal. Held, That the agreement between S. & D. and S. was a charter of the vessel.

2. Under this contract, S. & D. were entitled to have, for their £1,500, the space of a net measurement of 537 tons for cargo; and unless they were allowed to have it, S. did not perform his covenant, that they should be allowed to carry a full and complete cargo, notwithstanding a clause in the charter, that the cargo should not exceed what the vessel "can reasonably stow and carry over and above her tackle, apparel, provisions and furniture."

3. S. & D., therefore, were entitled to recover the difference between the freight actually earned, and that which would have been earned if such covenant had been fully performed.

[This was a libel by Jacob W. Schmidt and Herman Dill against Alexander Smith, to recover freight money.]

W. R. Beebe, for libellants.

E. H. Owen, for respondent.

BLATCHFORD, District Judge. On the 19th of December, 1872, at London, the Glasgow & Cape Breton Coal & Railway Company entered into a written charter party with the respondent, in respect to the British steamship Dione. The charter party described the vessel as "the steamship called the Dione, of the net measurement of 537 tons, or thereabouts." The charter party contained an agreement, that the vessel should proceed to New York, and there load a cargo of lawful merchandise, in bulk, "not exceeding what she can reasonably stow and carry, over and above her tackle, apparel, provisions and furniture," and therewith proceed to a safe port in the United Kingdom, or a safe port on the continent of Europe, between Havre and Hamburg, both inclusive, calling for orders at Queenstown, Falmouth or Plymouth, at master's option. The rate of freight for the cargo was prescribed by the charter party.

The respondent, by his agent, at New York, on the 11th of January, 1873, entered into a written agreement with the libellants, in these words: "I, George Pendreigh, agent for Alexander Smith, Esq., charterer of the screw steamer Dione, do hereby charter said steamer Dione to Jacob W. Schmidt & Co., for a voyage from New York to one safe direct port on the continent, between Havre and Hamburg, both included, port to be named on signing bills of lading, for the sum of fifteen hundred pounds British sterling, in full for a full and complete cargo of lawful merchandise. Any difference between said fifteen hundred pounds sterling and bills of lading to be settled before sailing, if in favor of George Pendreigh, in cash at current rate of exchange, less insurance; if in favor of Jacob W. Schmidt & Co., by captain's draft on consignee, at port of discharge, payable ten days after arrival. Steamer in ballast and to haul to a pier on East river not above pier 40. Lay days not to commence until steamer is in berth and ready for cargo. All other conditions as per charter party, dated London, December 19, 1872. Steamer to employ J. W. Schmidt & Co.'s stevedore at customary rates."

The instrument of the 11th of January, 1873, is manifestly a charter of the vessel by the respondent to the libellants, for the voyage named in it. It so expressly states. The price to be paid was £1,500, "for a full and complete cargo." By this instrument, construed in view of the charter party, the vessel was to give bills of lading for the cargo to be laden, and to collect the freight thereon. If such freight fell short of the £1,500, the libellants were to pay the difference in cash to the respondent, before the vessel should sail. If such freight exceeded the £1,500, the excess was to be paid by the respondent to the libellants, by a draft of the master of the vessel on her consignee, payable ten days after the arrival of the vessel on the other side. By the expression, "all other conditions as per charter party," the respondent assumed to carry out towards the libellants the covenants therein contained on the part of the parties who chartered the vessel to him. It appears by the evidence, that the libellants, before executing the instrument of January 11, 1873, learned, from a copy of the charter party referred to in it, what that charter party stated as to the net measurement of the vessel, namely, that she was "of the net measurement of 537 tons, or thereabouts," and that they computed, on the basis of that measurement, as a measurement of the space free for cargo, as to whether they could afford to pay the sum of £1,500 for the hire of the vessel. The evidence shows that the words "net measurement," in reference to a British vessel, mean the statement in the register of the vessel as to her net measurement, and that, in such register, the spaces not set apart for the use of the vessel are put down by items, by measure-

ment tons, and the total is her net measurement tonnage, and represents, and is understood, in commercial signification, to mean, the space free for the carrying of cargo. I am of opinion, that, under this contract, on the evidence, the libellants were entitled to have, for their £1,500, the space of a measurement of 537 tons for the carrying of cargo, and that, unless they were allowed to have that space, the respondent did not perform his covenant, that they should be allowed to carry a full and complete cargo. It is true, that the charter party provides that the cargo shall not exceed what the vessel "can reasonably stow and carry, over and above her tackle, apparel, provisions and furniture;" but the evidence shows that the allowance for the measurement for the tackle, apparel, provisions and furniture of the vessel is not set down among the spaces which make up the net measurement tonnage.

The evidence shows that the vessel had on board, in a part of the space which was properly space for the carrying of cargo, a quantity of coal. This coal occupied a space into which the libellants could have put 150 tons, by measurement, of such general cargo as they put on board of the vessel. The coal belonged to the vessel. It was not taken out. It amounted, in weight, to 200 tons. When the libellants had put on board a certain quantity of cargo, the vessel was down so deep that the master and the stevedores refused to take on board any more cargo. At that time, there was empty cargo space into which 50 tons, by measurement, of such general cargo as the libellants put on board of the vessel could have been stowed. The weight of the 200 tons of coal was such, that, if the space occupied by it had been filled by the 150 measurement tons of cargo, and the empty cargo space had been filled by the 50 measurement tons of cargo, the vessel would have been no deeper than she was. The libellants had engaged cargo sufficient to supply such additional 200 measurement tons of cargo. The cargo put on board and the cargo engaged was an average general cargo as to weight, and not an over heavy cargo in weight for the space it occupied. The vessel left, on her voyage, with 468 measurement tons of cargo. She could have taken, as before shown, if the 200 tons weight of coal had been out of her, 200 measurement tons more of cargo, making 668 measurement tons in all. The evidence shows, that a vessel will generally carry a cargo greater in number of measurement tons by 25 per cent., than the number of tons stated in her register as her net measurement tonnage. For this vessel, that would make 671 measurement tons. A measurement ton is 40 cubic feet, and is called equal to a ton of 2,240 pounds.

The libellants claim, in their libel, that the freight money on a full cargo would have been £1,898.3.6 and that they are entitled to recover from the respondent £398.3.6. The

libel is substantially framed to recover for the freight money which would have been earned by the vessel on cargo which her master refused to carry, and which could have been safely stowed in space which properly formed part of the space composing the 537 tons net measurement. The libellants were entitled to such space for cargo, and the respondent and his agents wrongfully withheld it.

There must be a decree that the libellants are entitled to recover such freight money. An account of the entire freight money must be stated, on a reference to a commissioner, on the basis of adding to the actual freight money on the cargo carried, the freight money which would have been received on 200 measurement tons more of cargo, at the rate of 40 cubic feet per ton, at the average rate of freight for the cargo carried by the vessel, and credit must be given to the respondent, in such account, for the sum of £1,500 sterling.